Bezanson v. Fleet Bank, NH          CV-90-118-B    08/27/93

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE

Dennis Bezanson

v.                              Civil No. 90-118-B

Fleet Bank, NH


**O R D E R**

Plaintiff, Dennis Bezanson, Trustee in Bankruptcy for Unitex, Inc. ("Unitex"), obtained a jury verdict of $379,779.21 against Fleet Bank, N.H. ("Fleet") as a result of Fleet's alleged failure to dispose of security it seized from Unitex in a commercially reasonable manner.  Fleet challenges the verdict in a motion for judgment as a matter of law and a new trial arguing that its actions were commercially reasonable, that plaintiff failed to prove damages, and that the jury was given erroneous instructions concerning Fleet's duty to dispose of the security in a commercially reasonable manner.  As I explain in greater detail below, I grant Fleet's motion for judgment as a matter of law because no reasonable finder of fact could conclude that plaintiff proved his damages with reasonable certainty.

## I.  **FACTS**

Unitex manufactured and sold graphics equipment to newspaper and magazine publishers.  By the time it began to experience financial difficulties in early 1985, Unitex owed approximately $3 million to Fleet's predecessor, Indian Head National Bank (the "Bank").[1]  In March 1985, Unitex reached an agreement with the Bank to surrender its accounts receivable, inventory, and other assets (collectively "Unitex Assets") that were subject to the Bank's security interest.  Four months later, Unitex filed for bankruptcy protection and listed debts of approximately $3.7 million to other unsecured creditors.  Bezanson was appointed trustee of the Bankruptcy estate and is representing the interests of Unitex's unsecured creditors in this action.

After taking possession of the Unitex Assets, the Bank determined that the assets would command a substantially higher price if Unitex was sold as an ongoing business.  Accordingly, the Bank hired consultants to run Unitex until a buyer could be found for the business.  The Bank also worked closely with a group of Unitex's customers ("Users Group") whose support was

---

[1] Between the time it took possession of the Unitex Assets and the time it agreed to sell the assets, the Bank collected certain accounts receivable and incurred certain expenses that resulted in a net figure of $3,020,220.29, which was owed to the Bank as of June 20, 1985.

2

crucial to the viability of the business. The Users Group informed the Bank that it would have to find a new owner for Unitex before the Annual Newspaper Products Convention ("ANPA Convention") in early June in order to keep members of the group from finding new suppliers at the Convention. In an effort to sell the business prior to the ANPA Convention, the Bank held discussions with more than 20 potential buyers. However, it met with little success prior to late May when Graphics Technology, International, Inc. ("GTI") emerged as a potential purchaser.

A. GTI's Offer

GTI was a shell corporation formed by Robert Dambach, James McCauley, and John Vergoz for the purpose of purchasing Unitex. All three men had worked in the graphics technology field and were generally familiar with Unitex. Their proposal required GTI to identify private lenders who would loan GTI the money to purchase Unitex and fund operating expenses until the business could be reestablished. GTI characterized its proposal as a leveraged buyout in which the Unitex Assets would serve as the sole security for GTI's loan. To assist in identifying potential lenders, GTI retained a financial advisor, A R Technology, Inc. ("A R Technology"), and a small investment banking firm, Parker Benjamin, Inc. ("Parker Benjamin").

On May 22, 1985, GTI made its initial offer to purchase Unitex for $3.25 million. In its letter transmitting the offer, GTI stated that it intended to use investment banking to finance the purchase and added that the offer was "subject to [its] receipt of a complete list of International Distributors and users from the Indian Head National Bank." In the days that followed, Bank officials attempted to evaluate GTI's offer by (i) holding discussions with the principals in GTI and their financial advisor and investment banker, and (ii) checking into the credit history of Dambach, McCauley, and Vergoz, as well as a business with which they were affiliated. In this regard, a Bank official spoke with Dr. Mierza of A R Technologies, who reported that GTI had selected an investment bank, and it was enthusiastic that financing for the transaction could be obtained.[2] Another Bank official spoke with Mr. D'Avanzo of Parker Benjamin, who told the official that Parker Benjamin had a "high level of confidence [the] deal can be done and rather quickly."

---

[2] At trial, a bank official testified about a conversation that occurred one week later in which Dr. Mierza acknowledged, in the words of the official, that "the likelihood of GTI raising the type of dollars that we were talking about to complete this transaction was speculative at best." Trial Transcript ("Tr.") at 200.

4

The principals in GTI met with Bank officials to discuss the GTI offer on May 29, 1985. Two significant points of disagreement were discussed at this meeting. First, GTI objected to the Bank's demand that GTI post a $200,000 non-refundable deposit. Second, the parties disagreed concerning the management of Unitex during the interim period between acceptance of the offer and closing. GTI suggested in its initial proposal that it would run the business, that funds generated by the business would be paid into an escrow fund to be managed by Parker Benjamin, and that business expenses would be paid from the escrow fund. The Bank, however, objected because it was concerned that the value of Unitex might decline before the sale could be completed if GTI were allowed to use the proceeds of the escrow account to pay operating expenses.

On June 1, 1985, GTI revised its offer and increased the purchase price to $3.4 million. GTI made no mention of the Bank's earlier demand for a $200,000 non-refundable deposit in its revised offer. However, GTI did propose that two escrow accounts be opened and managed by the Bank and that all monies received by Unitex during the transition be paid into these two accounts. One account would contain "monies received for the shipment of everything going out of the factory at Inventory

5

Value."  Monies placed in this account would be deducted from the purchase price.  The other escrow account would contain "deposits reflecting an increase in any value over and above the current value . . . ."  Proceeds from the second account would be used to fund business operations during the transition.  GTI also proposed that it would form a separate entity to manage Unitex until the sale could be completed.

The parties met again on June 4, 1985.  At the meeting, GTI refused the Bank's demand for the $200,000 non-refundable deposit, claiming it had not been provided information on Unitex that GTI needed to complete its due diligence review.  During discussions concerning the upcoming ANPA Convention, GTI also requested an advance of $120,000 from the Bank to fund the cost of representing Unitex at the ANPA Convention.  These differences were not resolved and the meeting adjourned.  Two days later, GTI was informed that the Bank had elected to sell Unitex to another party.

A Bank official testified that the Bank rejected GTI's offer because it had significant concerns as to whether GTI would be able to obtain the financing needed to complete the transaction.[3]

_____

[3] The Bank official also testified that he was concerned with the GTI offer in part because another company with which two of GTI's principals were involved had a loan with the Bank which

6

Further, given the Bank's perceived need to find a buyer prior to the ANPA Convention and GTI's inability to complete the purchase prior to the convention, the official testified that the Bank decided to accept an alternative proposal made by another entity in whom Bank officers had more confidence. Notwithstanding these concerns, the official testified that the Bank would probably have accepted GTI's offer if it had produced the non-refundable deposit.

B. Chorus' Offer

On June 3, 1985, while negotiations between the Bank and GTI were ongoing, Chorus Data Systems, Inc. ("Chorus") submitted a proposal to form a joint venture with the Bank to purchase Unitex. Pursuant to this proposal, Chorus and the Bank would form a new corporation to acquire the Unitex Assets, and the Bank would receive 49% of the stock in the new corporation in exchange for the assets. Chorus would receive warrants on the Bank's stock exercisable for $3 million plus compounded interest of 2.5% per month. However, if the new corporation was later sold or

_____

was in a non-accrual status. Moreover, Bank records were produced at trial in which Bank officials expressed uncertainty concerning GTI's ability to obtain financing. However, one of the principals in GTI testified that the Bank had never expressed any concern during the negotiations that GTI might not be able to obtain financing.

7

merged with another corporation, the proposed agreement specified that the Bank would reap a substantial additional profit -- the size of which would depend on the value of the business when it was sold or merged. Anticipating the possibility that other creditors of Unitex might object to the transaction, the proposal also stated that "[i]f, under an extremely conservative reading of the Bank's duty, the transaction is not sufficiently 'arms length,' warrants on a tiny fraction of the JV's [joint venture] shares can be issued to a junior creditors' trust after negotiation with creditors."

Bank officials met with representatives of Chorus on June 5, 1985 and informed Chorus that it was not interested in a joint venture because of unspecified regulatory problems. The parties then discussed an alternative proposal under which Chorus would form a new entity that would give the Bank a $3 million note in exchange for the Unitex Assets. The note would be converted to convertible preferred stock in the new entity after a specified period. According to Bank records and the testimony of a Bank official, the Bank and Chorus reached an agreement in principle along these lines either at the June 5, 1985 meeting or the next day. As a result, Chorus went to the ANPA Convention to assure members of the Users Group that Unitex would soon be operating

8

under new ownership.

The agreement between Chorus and the Bank was reduced to writing and signed after the ANPA Convention on June 20, 1985. The agreement provided that a new entity, Cuniform Systems, Inc. ("Cuniform"), would purchase the Unitex Assets for $3 million. The purchase price would be funded with a note that would be exchanged by the Bank within 120 days for convertible preferred stock in Cuniform. If Cuniform was liquidated or dissolved, the agreement specified that the Bank's stock would be valued at $3 million plus compounded interest of 1.5% per month. If the stock was redeemed at Cuniform's option, the Bank would be paid $3 million plus compounded interest of 2.5% per month. Finally, if, as the parties anticipated, Cuniform went public, was sold, or was merged with another entity, Cuniform's conversion rights would terminate, and the Bank's stock would be converted to common stock at an agreed-upon ratio. Thus, if Cuniform proved to be successful, the Bank would recover the approximately $3 million it loaned to Unitex plus an additional amount that would depend upon the value of Cuniform. Chorus was not required to put down a deposit under the agreement. Nor was it required to guarantee the $3 million loan.

Although the Bank never recovered anything under its agreement with Cuniform, Unitex's debt to the Bank was reduced by the $3 million purchase price Cuniform agreed to pay for the Unitex Assets.

## II. <u>DISCUSSION</u>

Fleet challenges the jury's verdict by arguing that plaintiff failed to produce sufficient evidence to sustain the jury's finding that the Bank disposed of the Unitex Assets in a commercially unreasonable manner. Fleet also argues that plaintiff failed to prove his damages even if the Bank unreasonably disposed of the assets. In reviewing these arguments, I first consider the standards of review against which I consider Fleet's motion for judgment as a matter of law and a new trial. I then address the merits of Fleet's arguments.

A. <u>Standards of Review</u>

In considering Fleet's motion for judgment as a matter of law, I will apply the same standard of review that formerly governed a motion for judgment notwithstanding the verdict. <u>Putnam Resources v. Pateman</u>, 958 F.2d 448, 459 n.7 (1st Cir. 1992). Accordingly, in ruling on the motion, I will not

> consider the credibility of witnesses, resolve conflicts in the testimony, or

10

> evaluate the weight of the evidence. Rather,
> [I] must examine the evidence and the
> inferences reasonably to be drawn therefrom
> in the light most favorable to the nonmovant
> . . . . A judgment notwithstanding the
> verdict should be granted only when the
> evidence, viewed from this perspective, is
> such that reasonable persons could reach but
> one conclusion.

Id. at 459 (quoting Wagenmann v. Adams, 829 F.2d 196, 200 (1st

Cir. 1987) (citations omitted)).

The standard I will apply in considering Fleet's motion for

a new trial is somewhat different:

> A trial judge may not grant a motion for a
> new trial merely because he or she might have
> reached a conclusion contrary to that of the
> jurors, rather the trial judge may set aside
> a jury's verdict only if he or she believes
> that the outcome is against the clear weight
> of the evidence such that upholding the
> verdict will result in a miscarriage of
> justice.

Id. (quoting Conway v. Electro Switch Corp., 825 F.2d 593, 598-99

(1st Cir. 1987) (citations omitted)).

With these standards in mind, I turn to the specific

arguments Fleet makes in support of its motion.

B.  Commercial Reasonableness

1.  A Definition

N.H. Rev. Stat. Ann. ("RSA") § 382-A:9-504(3) provides in

pertinent part that the "[s]ale or other disposition [of

11

collateral] may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." (emphasis added).

Although the Uniform Commercial Code does not define the term "commercially reasonable," it is apparent from the context in which it is used that commercial reasonableness encompasses the totality of circumstances surrounding the disposition of collateral. Moreover, except for certain specified exceptions not applicable here, no single factor, even price, will conclusively determine the commercial reasonableness of a secured party's actions. See RSA 382-A:9-507(2) ("[t]he fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient . . . ."). Although the New Hampshire Supreme Court has not addressed this issue, the view that commercial reasonableness can only be determined upon a consideration of all of the surrounding circumstances is consistent with the meaning that other jurisdictions have given the term. In re Zsa Zsa Ltd., 352 F. Supp. 665, 670 (S.D.N.Y. 1972), aff'd mem., 475 F.2d 1393 (2d Cir. 1973). See generally Richard C. Tinney, What is "Commercially Reasonable" Disposition

12

of Collateral Required by UCC § 9-504(3), 7 A.L.R. 4th 308, 316 (1981):

> Generally, the courts which have considered the question have held, either expressly or by necessary implication that the determination of whether a secured party has disposed of repossessed collateral in a commercially reasonable manner . . . should be based on a consideration of all relevant factors in each individual case, with emphasis being given to the aggregate of circumstances rather than to specific details taken in isolation . . . .

This understanding is also consistent with the standard the New Hampshire Supreme Court used in describing a mortgagee's duty to obtain a fair price at a foreclosure sale. Murphy v. Financial Dev. Corp., 126 N.H. 536, 541 (1985) ("[w]hat constitutes a fair price . . . depends on the circumstances of each case. Inadequacy of price alone is not sufficient to demonstrate bad faith unless the price is so low as to shock the judicial conscience"). Accordingly, in ruling on Fleet's post-trial motions, I will use a definition of commercial reasonableness that does not assign dispositive significance to any single factor, but instead considers all relevant circumstances, including matters such as price, contingencies, time of performance, and the Bank's good faith. The commercial reasonableness of the Bank's actions thus will depend upon

13

whether, under the totality of circumstances, a secured party that is mindful of its duty to exercise reasonable efforts to obtain the highest price for the seized collateral could have accepted Chorus' offer in light of GTI's higher but contingent offer.[4]

### 2. Application

In its post-trial motion, Fleet argues for the first time that its commercial reasonableness must be evaluated from Unitex's perspective. What I understand Fleet to mean by this is that it was irrelevant from Unitex's perspective that the Bank financed Cuniform's purchase of the Unitex Assets since its sale of the assets reduced Unitex's debt by $3 million, even though the Bank failed to recover on the loan to Cuniform. According to Fleet, the jury should have viewed Chorus' offer as a firm offer without contingencies because the Bank had made a commitment to finance the sale when it accepted Chorus' offer. Thus, Fleet argues that no reasonable jury could find for plaintiff since the

---

[4] Fleet argues that it is entitled to judgment as a matter of law because a secured party can never act in a commercially unreasonable manner by rejecting an offer that is contingent on some future event or which involves delays or deferred payment. I reject this argument because I believe that it is inconsistent with the correct definition of commercial reasonableness. Accordingly, I also reject Fleet's argument that a new trial is required because I failed to properly instruct the jury on Fleet's theory of commercial reasonableness.

Bank's rejection of GTI's contingent offer in favor of Chorus' lower but non-contingent offer could not as a matter of law have been commercially unreasonable.

While I generally agree that the reasonableness of a secured party's disposition of collateral ordinarily will be determined by looking to the effect of the disposition on the debtor, I am not persuaded that this new argument warrants either the entry of judgment as a matter of law or a new trial. One aspect of commercial reasonableness not addressed by Fleet's theory of the case is its good faith. See, e.g., In re Excello Press, Inc., 890 F.2d 896, 905 (7th Cir. 1989); Swanson v. May, 697 P.2d 1013, 1017 (Wash. App. 1985)(and cases cited therein); Peoples Acceptance Corp. v. Van Epps, 60 Ohio App. 2d 100, 106-07, 395 N.E. 2d 912, 916-17 (1978). Because good faith may be considered in assessing a secured party's commercial reasonableness, a juror might reject the secured party's claimed reasons for turning down a larger offer and instead find that the secured party's actions were prompted by a bad faith desire to recover more than the party was entitled to recover from the disposition of the collateral. Thus, so long as sufficient evidence was produced at trial to justify a juror's conclusion that the secured party rejected the higher offer in bad faith, a verdict finding that

15

the secured party disposed of security in a commercially unreasonable manner should not be overturned.

In the present case, plaintiff produced ample evidence of the Bank's bad faith to sustain the jury's decision that the Bank acted unreasonably. First, viewing the evidence in the light most favorable to plaintiff, the jury was presented with evidence that the Bank had rejected a $3.4 million offer in favor of a substantially lower offer. While it is true that the GTI offer contained contingencies that could not be resolved until after the ANPA Convention, the jury was also presented with evidence from which it could reasonably conclude that the offer the Bank accepted remained only an oral agreement in principle which was not reduced to writing and signed until well after the ANPA Convention. Thus, the jury might well have attached little importance to the Bank's claim that it had to have a new owner for Unitex in place prior to the Convention.

Second, while the Bank claimed to have serious concerns about GTI's ability to finance its offer, the jury may well have viewed this assertion with skepticism since the Bank did little to investigate this issue beyond placing calls to GTI's investment advisors and eliciting statements indicating that the advisers were optimistic that financing could be found.

16

Moreover, the jury might well have questioned the sincerity of the Bank's concern about GTI's ability to obtain financing if it accepted the testimony of one of plaintiff's witnesses that the Bank never expressed any such concern during its negotiations with GTI.  Similarly, the Bank's demand for a non-refundable deposit might well have been viewed by the jury as a pretext for refusing GTI's offer since the Bank agreed to provide 100% financing to Cuniform even though (i) Cuniform too was a shell corporation, and (ii) Chorus refused to guaranty Cuniform's debt.

Finally, and most importantly, the jury might reasonably have concluded that the Bank's rejection of GTI's offer was prompted by a bad faith effort to reap a benefit from the transaction which it would not have to share with Unitex's creditors.  There is no dispute that the proposal the Bank accepted would have allowed the Bank to recover substantially more than it was owed if Cuniform was successful.  Moreover, evidence was produced at trial that the Bank was aware that other creditors of Unitex might make a claim to any excess money the Bank recovered from the disposition of the Unitex Assets unless provisions were made to shield such money from the creditors' claims.  Accordingly, there was substantial evidence to support a finding that the Bank's actions were driven by a bad faith desire

to reap an unjustified profit from the disposition of the assets. This evidence, when considered with the evidence of the higher price of the GTI offer, was sufficient to permit a reasonable juror to find for plaintiff on this issue. For the same reason, the jury's decision is not against the clear weight of the evidence. Therefore, neither judgment as a matter of law nor a new trial is warranted on this issue.

C. Damages

If a secured party unreasonably disposes of a debtor's assets, the debtor may recover as damages "any loss caused by" the secured party's unreasonable conduct. RSA 382-A:9-507. Although the New Hampshire Supreme Court has not established a standard against which to test the sufficiency of the evidence needed to support a damage award for the commercially unreasonable disposition of collateral, it has many times considered the sufficiency of a claim for damages in other commercial contexts. For example, in Grant v. Town of Newton, 117 N.H. 159, 162 (1977), the Court stated that "[i]t is general law that one who claims damages has the burden of proof. He must by a preponderance of the evidence show that the damages which he seeks were caused by the alleged wrongful act and he must show the extent and amount of such damages." In other decisions, the

18

Court has consistently admonished the trial courts that a damage award for lost profits in a breach of contract case will not be allowed unless it was reasonably certain that profits would have been earned in the absence of the breach.  Great Lakes AirCraft Co. v. City of Claremont, 135 N.H. 270, 296-97 (1992)(setting aside jury award for lost profits where such profits were dependent in part upon a financing scheme that "was still in flux"); Hydraform Prods. Corp. v. American Steel & Alum Corp., 127 N.H. 187, 197 (1985).

In the present case, plaintiff's sole argument on damages is that GTI's $3.4 million offer would have generated approximately $400,000 for Unitex's creditors that they did not receive because the Bank wrongly accepted Chorus' $3 million proposal.  To sustain the verdict against Fleet's argument that plaintiff failed to prove damages, plaintiff must establish that it produced sufficient evidence to permit a reasonable juror to conclude by a preponderance of evidence that GTI would have been able to perform under the contract if the Bank had given GTI the opportunity.  Without such evidence, plaintiff's request for damages is nothing more than an invitation to speculate about the harmful consequences of the Bank's wrongful conduct.

19

The principal obstacle plaintiff faces in his effort to sustain the jury's verdict is that GTI's offer was contingent on financing. Plaintiff argues, however, that the optimism concerning GTI's ability to obtain financing expressed by GTI's investment advisors was sufficient to sustain the jury's verdict.[5] In their entirety, these statements are as follows:

> 1. "They [GTI] have selected a regional investment bank, and based on their enthusiasm about a successful placement, are ready to move the proposed closing date to six weeks from the time we accept their offer;"
>
> 2. "[Parker Benjamin has] a high level of confidence [the] deal can be done and rather quickly;"
>
> 3. [Parker Benjamin is] "very confident [the] deal can be done;" and
>
> 4. "Based on the information he [Mr. D'Avanzo] had there was a high probability of raising the monies."

Even construing this evidence in the light most favorable to plaintiff, these statements amount to nothing more than

---

[5] The statements on which plaintiff relies were out-of-court statements made to Bank officials during the course of negotiations. Accordingly, the statements would have been inadmissible heresay if they had been offered to prove that GTI would have been able to obtain financing if the Bank had accepted GTI's offer. However, since Fleet failed to object to the admissibility of the statements or request a limiting instruction, I will consider them in ruling on Fleet's motion.

speculation about the GTI's ability to obtain financing. Plaintiff argues that the Bank withheld information about Unitex which GTI needed before it could decide whether to proceed with its proposal. Since GTI's investment advisors also lacked this information, plaintiff, in effect, must argue that even though GTI did not know enough about Unitex to decide whether to purchase the assets, its investment advisors had enough information to make credible assessments as to the likelihood that GTI would be successful in obtaining financing. Standing in isolation, such statements are simply insufficient to establish plaintiff's damages with reasonable certainty.

Plaintiff argues that its evidence of damages should be liberally construed since it was the Bank's unreasonable refusal of GTI's offer that prevented GTI from demonstrating that it had the ability to obtain financing. I disagree. This is not a case where a defendant's wrongful conduct made it impossible for the plaintiff to prove his damages. Plaintiff could have subpoenaed GTI's investment advisors or produced other experts at trial to testify about the general availability of financing for similar proposals at the time this transaction would have occurred. Moreover, plaintiff could have obtained all available information about the value of the Unitex Assets during discovery. Thus, its

21

experts could have provided informed testimony on the real availability of financing for GTI's proposal.  In short, nothing prevented plaintiff from producing something more than mere unsworn expressions of optimism from GTI's investment bankers to prove that GTI would have been able to obtain financing if the Bank had accepted its offer.  Plaintiff's failure to do so here deals a fatal blow to his case.

Because plaintiff failed to offer competent evidence of damages which were sufficient to permit a reasonable juror to conclude that plaintiff proved his damages with "reasonable certainty," Fleet is entitled to judgment as a matter of law. See University of R.I. v. A.W. Chesterton Co., No. 92-1034, 1993 U.S. App. LEXIS 20646, at *67 (1st Cir. Aug. 16, 1993)(directed verdict upheld where insufficient evidence of damages was presented); TK-7 Corporation v. Estate of Ihsan Barbouti, 993 F.2d 722, 726-36 (10th Cir. 1993)(directed verdict); Belanger v. Boise Cascade Corporation, 968 F.2d 254, 258-59 (2d Cir. 1992)(directed verdict).

## III. CONCLUSION

Fleet's Motion for Judgment as a Matter of Law (document no.

22

32) is granted.  In light of this ruling, Fleet's Motion for a New Trial is moot.


        SO ORDERED.




                                    _____
                                    Paul Barbadoro
                                    United States District Judge

August 27, 1993

cc:  Dennis G. Bezanson, Esq.
     N. Charles Remmel, II, Esq.
     Francis L. Cramer, III, Esq.