**Mary Lou BELANGER,**
**Plaintiff–Appellant,**

v.

**BOISE CASCADE CORPORATION,**
**Defendant–Appellee.**

No. 1295, Docket 91–9330.

United States Court of Appeals,
Second Circuit.

Argued April 8, 1992.
Decided June 29, 1992.

Peter W. Hall (Abell, Kenlan, Schwiebert & Hall, P.C., Rutland, Vt., of counsel), for plaintiff-appellant.

Anthony B. Lamb (Paul, Frank & Collins, Inc., Burlington, Vt., of counsel), for defendant-appellee.

Before: FEINBERG, WINTER and ALTIMARI, Circuit Judges.

WINTER, Circuit Judge:

Mary Lou Belanger commenced this action in the District of Vermont against her former employer, Boise Cascade Corporation. She alleged that Boise Cascade had breached an agreement to assist Belanger in securing other employment within the corporation in the event that her position was terminated. A jury trial ended at the close of her main case when Judge Billings granted Boise Cascade's motion for a directed verdict.

Judge Billings held that Boise Cascade had met its obligation to assist Belanger in finding new employment of comparable responsibilities and salary. In particular, he noted that Belanger had secured another position at Specialty Paperboard, Inc. ("SPI") at her previous salary. We affirm but on the ground that Belanger failed to prove damages.

## BACKGROUND

Because the verdict was directed against Belanger, we view the evidence in the light most favorable to her. Belanger was employed in various positions in the Missisquoi Pulp and Paper Mill ("Missisquoi Mill" or "Mill") for over thirty years. During that period, the ownership of the Mill changed hands several times. In April 1983, the Mill was bought by Boise Cascade as a part of its Specialty Paperboard Division, which owned three other paper mills. At that time, Belanger was serving as assistant to the off-site general manager. Boise Cascade eventually hired her as a materials manager, a position that involved purchasing and contracts, inventory, and the scheduling of two paper machines. She remained in this position for about three years, until A. Ben Groce, the general manager of the Specialty Paperboard Division, asked Belanger if she was interested in joining the so-called Project to Improve Revenue Cycles ("PIRCS") team. The PIRCS team was comprised of representatives from various Boise Cascade divisions who were responsible for analyzing the information processing systems used in each

division and for recommending ways to make the systems more uniform.

Belanger, although interested in the PIRCS position, was concerned that she might lose her pension rights if the project was terminated before the vesting date of April 1988. She was also concerned about her future job security with Boise Cascade because her job as materials manager would have to be filled by someone else if she took the PIRCS position. She discussed these concerns with Groce in a telephone conversation, followed by a memorandum to Groce dated October 8, 1987, that stated in pertinent part:

It is my understanding, based on our phone conversation of 10–8–87 that at the completion of this revenue study project, it is the intention of Boise Cascade to return me to a position at or above the range and penetration rate in effect at that time. (appox [sic] project timetable—3 years)

Belanger also discussed the PIRCS job with her division's general manager, Eric Wolinsky. About a week later, she attended a PIRCS meeting, after which she decided to accept the PIRCS position. However, because she had not received a confirmation memorandum regarding Boise Cascade's duty to find her comparable employment when the new project was terminated, she again called Groce. In a memorandum to Belanger dated October 16, Groce stated:

When the project ends, Boise Cascade has the intention of placing you in a job which is at or above your current salary range, and at a level which is at or above your current range penetration. While this is not a guarantee of job security or continuing employment, it is a commitment on the part of the company to assist you on a corporation-wide basis toward the goals mentioned above.

If, in the unlikely event, this project is terminated before April 13, 1988, we will first endeavor to situate you a in [sic] position as outlined above. Should we be unable to do so, we are committed to establishing your 100% vesting rights within Boise Cascade, for which you would have become eligible on April 13, 1988.

Belanger thereafter assumed her position as the Specialty Paperboard representative to PIRCS, in which she received a favorable evaluation reflected in two salary increases. On or about April 10, 1989, Belanger was informed that the Specialty Paperboard Division was going to be sold to SPI and would no longer be represented in PIRCS. Accordingly, she would be terminated from that position.

Seeking a new position in Boise Cascade, Belanger contacted various individuals within the corporation. She spoke to Larry Burns, to whom the personnel managers of various Boise Cascade divisions reported. He directed her to corporate headquarters in Boise, Idaho. Mike Guartney, the Human Resources Director at corporate headquarters, told her that Boise Cascade "had no responsibility towards [her]; that if [she] were to file an application with him, that [she] would be treated the same way as anyone off the street." On April 21, 1989, Belanger wrote to Boise Cascade vice president John Wasserlein. In June 1989, she received a response from corporate counsel, who informed her that Boise Cascade had no job opportunities available for her and that "Boise has agreed with the management of the new company that all of the present employees of the Specialty Paperboard Division will be offered employment by the new company, and Boise Cascade will not attempt to retain any of those employees."

Despite the negative responses, Belanger testified that, with information provided by the Boise Cascade computer network, she continued to send out resumes within the corporation. She was never interviewed for any of the positions for which she applied. However, sometime in mid-June 1989, she received an unsolicited telephone call from a Boise Cascade mill in Vancouver, Washington, regarding a managerial position there. She was flown out at corporate expense for an interview but was later informed that the position would not be filled.

Frustrated with her search within Boise Cascade, Belanger accepted an offer from SPI in the spring or early summer of 1989. She was assigned to work in "special projects." Belanger testified that her main responsibility was "[a]nalyzing raw stock in and product out ... [as a] profit improvement project." Belanger was paid approximately the same salary and benefits that she was paid as materials manager at Boise Cascade. Belanger appears not to have been a happy employee. She testified that the special projects position was "make-work." In August 1989, after only a few months at SPI, Belanger resigned. She told Wolinsky, now her SPI supervisor, that she was resigning because the special projects job provided no employment security and because the company "could not afford her." Belanger is currently unemployed.

Belanger commenced the instant action on March 9, 1990, alleging that Boise Cascade breached its October 1987 agreement to attempt to find her another position within the corporation when her PIRCS work was completed. She also asserted a claim for relief based on the doctrine of promissory estoppel. The jury trial began on November 13, 1990. On November 20, at the close of Belanger's main case, Boise Cascade moved for a directed verdict, which was granted.[1] Judge Billings held that, as a matter of law, Boise Cascade did not breach its agreement to assist Belanger in securing "a job within the company or elsewhere." He noted that Boise Cascade gave her use of the company's computer system in her employment search and helped to obtain her a position at SPI with comparable responsibility, benefits, and salary. This appeal followed.

## DISCUSSION

Viewing the evidence in the light most favorable to the non-moving party, a directed verdict may be granted only if there is no probative evidence to support a verdict for the non-moving party or the evidence so overwhelmingly favors the moving party that a reasonable jury could not find against her. *See Powell v. Gardner*, 891 F.2d 1039, 1043 (2d Cir.1989).

■ We agree with Belanger that she offered sufficient evidence of a breach by Boise Cascade to have that issue submitted to the jury. Groce committed Boise Cascade to "assist" Belanger on a "corporate-wide basis" to secure another position within the corporation. Giving this language its "plain, ordinary and popular" meaning, *Espinet v. Horvath*, 597 A.2d 307, 309 (Vt. 1991); we believe that Boise Cascade obligated itself to make good faith efforts to place Belanger in a position of a comparable level within Boise Cascade. We thus believe that Judge Billings erred in holding that Boise Cascade fulfilled its commitment to Belanger by assisting her in finding a comparable position "within the company or *elsewhere*" (emphasis added). Groce's memorandum stated that Boise Cascade was obligated to offer Belanger assistance to find employment within the corporation itself, and a trier of fact might conclude that even energetic assistance to find her a position elsewhere would not fulfill Boise Cascade's obligations.

There was, moreover, ample evidence that Boise Cascade breached the obligations established by Groce's memorandum. Although Belanger was afforded access to Boise Cascade's computer listing of available jobs, no one at Boise Cascade did anything affirmatively to assist her in getting a job. Boise Cascade did fly Belanger to Vancouver for an interview, but the interview was arranged through an unsolicited call. A trier might easily find that this single interview was not the assistance on a "corporate-wide basis" that Boise Cascade had promised Belanger.

Indeed, there was substantial evidence that Boise Cascade repudiated the obligations set out in Groce's memorandum.

---

1. We have previously noted that, in the ordinary case, the interests of efficient judicial administration are best served when the trial judge refrains from considering a motion for a directed verdict in favor of deciding a motion for judgment notwithstanding the verdict because of the effect of an appellate court's reversal in each situation. *See Mattivi v. South African Marine Corp. Huguenot*, 618 F.2d 163, 166 n. 2 (2d Cir.1980).

Burns told Belanger that Boise Cascade "had no responsibility towards [her]" and that she would be treated like any other applicant. Corporate counsel told her that "Boise Cascade will not attempt to retain any of those employees [from Specialty Paperboard Division]" because Boise Cascade had agreed with SPI that those employees would be offered work there. If the only issue were the question of a breach, therefore, we would have to reverse.

■ However, we believe that the directed verdict was correct because Belanger's main case failed to provide a factual basis upon which the jury could award damages. Damages for breach of contract are intended to restore the aggrieved party to the same economic position he or she would have enjoyed had the contract been performed. J. Calamari & J. Perillo, *Contracts* § 14–4 (3d ed. 1987). Boise Cascade's commitment was to provide Belanger assistance in finding another job within the corporation. A jury would be able to award damages for a breach of this obligation only if it found that such assistance more probably than not would have resulted in her finding a position at Boise Cascade. The record indicates little regarding relevant openings or hiring at Boise Cascade, and the requisite finding would, therefore, be based on considerable speculation. In view of our disposition of this matter, however, we may assume that such an award would withstand attack, particularly because the very nature of the breach impaired Belanger's ability to show damages with precision.

Although an award of damages in the instant matter would require, as stated, speculation that the assistance promised by Boise Cascade would have resulted in Belanger's obtaining a position within the corporation at a particular salary for a particular period of years, such a finding is only a necessary but not sufficient condition to a monetary recovery. Belanger had obtained employment at SPI that was comparable in benefits to her job at Boise Cascade. The immediate cause of her lost future wages was not a breach by Boise Cascade but her entirely voluntary resignation from SPI. Had her employment at SPI continued, she would have suffered no loss in earnings, and she cannot call upon Boise Cascade to pay damages for an injury that she inflicted on herself.

Belanger attempted to fill this void in her case by testifying that the special projects position was "make-work" that offered no job security, arguing in effect that her job at SPI would have soon come to an end even if she had stayed. Apart from her personal evaluation of the needs and intentions of SPI, the only evidentiary support for the assertion that the SPI job was temporary is that the position was not filled when she left.

The fact that her responsibilities at SPI were parsed out to other employees after she quit provides slim support, however, for a finding that the job would have soon been eliminated if she remained. First, Belanger does not dispute that she was a valued employee with very considerable experience in SPI's business. Indeed, Boise Cascade's counsel's letter strongly suggested that SPI would have regarded Boise Cascade's employment of Belanger as a breach of the purchase agreement. Second, her assertion that the job was without value to SPI is contradicted by her evidence that it entailed responsibilities others had to shoulder when she left. Third, the special projects position was tailored to her long experience in the Mill's business and could not be easily filled by a new employee. With her gone, a parsing of her responsibilities may have made more sense than hiring a new person. The failure to fill the position, therefore, does not indicate that the position was inevitably to be eliminated.

More fundamentally, Belanger's evaluation of her job security at SPI was her assessment of the state of mind of SPI executives responsible for hiring and firing. However, Belanger neither called SPI officials to testify regarding the likelihood of her remaining with SPI nor provided other evidence of their intentions. Her assessment was thus the sheerest speculation on her part, supported by neither prior act

nor word of the executives themselves, much less their testimony at trial.

Assessing damages for Belanger's future lost wages and benefits would thus have required the jury to speculate twice: once as to whether, with proper assistance, she would have gotten work at Boise Cascade; next, as to whether she would have been laid off at SPI. Given the minimal evidence supporting the first proposition and the lack of evidence other than Belanger's own unsubstantiated speculation supporting the second, we believe that a reasonable jury could not award damages in this case.

We therefore affirm.