Amelia GARGANO, Plaintiff,

v.

DIOCESE OF ROCKVILLE CENTRE; Education Department of Diocese of Rockville Centre; Sister M. Kieran, Superintendent of Schools; Trinity Regional School, Jeanne Morcone, Principal; Regional Planning Board, Defendants.

No. 92–CV–5341(FB).

United States District Court,
E.D. New York.

June 5, 1995.

As Amended June 13, 1995.

Schlachter and Mauro, Commack, NY (Reynold A. Mauro, of counsel), for plaintiff.

Bennett, Pape, Rice and Schure, Rockville Centre, NY (Michael G. Leavy, of counsel), for defendants.

### MEMORANDUM AND ORDER

BLOCK, District Judge:

This decision addresses the propriety of a jury's finding that the Diocese of Rockville Center ("Diocese") was an employer of Amelia Gargano ("Gargano") while she taught at one of the Diocese's parish schools, and the appropriate measure of damages and/or other remedies available to Gargano for a breach of an employment contract which the jury found existed between the Diocese and Gargano.

## I.

### PROCEDURAL BACKGROUND

On March 11, 1993, Gargano, a former teacher at the now-defunct St. Anthony of Padua Parish School ("St. Anthony"), filed an amended complaint against defendants Diocese, Trinity Regional School ("Trinity") and others[1] asserting a federal claim for an al-

---

**1.** The other defendants were voluntarily dismissed during the trial upon consent of the parties.

leged violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623, and two claims under this Court's supplemental jurisdiction, one for an alleged breach of an employment contract and the other for an alleged violation of New York State's anti-discrimination in employment statute, N.Y. Executive Law § 296, which Gargano subsequently abandoned. Gargano's claims arose from the closing of St. Anthony and the subsequent failure to hire or properly consider her for a position at Trinity, a new regional school which absorbed a number of local parish schools, including St. Anthony.

Beginning on February 28, 1995, the Court conducted a jury trial over the course of five days. At the close of Gargano's case and again after defendants had rested, defendants moved for judgment as a matter of law pursuant to Fed.R.Civ.Pro. 50(a) on the ground, *inter alia*, that the Diocese was not Gargano's employer. The Court denied these motions. On March 7, 1995, the jury returned a verdict *against* Gargano on the ADEA claim, but in *favor* of her on the breach of contract claim, concluding on a special verdict form that (i) the Diocese was Gargano's employer, (ii) a teachers' handbook constituted part of the employment contract existing between the Diocese and Gargano, and (iii) the Diocese breached certain provisions of the handbook. Trinity incurred no liability. The Diocese thereafter renewed its motion for judgment as a matter of law pursuant to Fed.R.Civ.Pro. 50(b), which the Court denied, and now seeks reargument contending once again that it was not as a matter of law Gargano's employer and challenging each of the jury's three factual findings. *See* Rule 3(j) of the Civil Rules for the United States District Court for the Eastern District of New York.

Apart from the Diocese's request for reargument, the parties submitted at the Court's request post-verdict memoranda discussing issues relating to the appropriate measure of damages and/or other remedies, if any, beyond a stipulated amount of damages to which the parties had agreed. The stipulation provided that Gargano would receive $83,300 if she proved successful on either her ADEA or breach of contract claim, as calculated from the day after Gargano's last employment with St. Anthony until the date of the verdict. Gargano's memorandum addressed these issues and argued for specific performance to compel Trinity to hire her or, in the alternative, "front pay" until Gargano reaches the age of 65 (she is currently in her late forties). The Diocese's memorandum contained only two paragraphs on the issue of appropriate damages/remedies, devoting the remainder of its memorandum to discussing its reargument contentions.

Upon consideration of the parties' various submissions, the Court grants reargument to the Diocese but, for reasons more fully set forth below, denies its request to set aside the verdict. Accordingly, the Court considers and resolves various issues relating to the proper measure of damages and/or other remedies.

## II.

### *FACTUAL BACKGROUND*

Prior to trial, the parties stipulated to a number of facts. In brief, they agreed that Gargano was employed by St. Anthony as a second grade teacher from 1969 until August 1992, when the school closed following the recommendations of several groups which had been organized for the purpose of studying whether to continue the Catholic elementary school system in its then-present form. Part of the recommendation was the formation of a Regional Planning Board organized from the six parishes within the geographic "region" in which St. Anthony was located. The Regional Planning Board recommended the closing of the schools within the region and the establishment of Trinity as a regional school in order to provide grade school children, who had formerly attended the parish schools, the best possible Catholic education.

As part of the staffing procedures for Trinity, guidelines were provided relative to the hiring of the faculty for the new school, who were to be drawn whenever possible from the ranks of those teachers that had formerly made up the faculties of the parish schools which were closing. Gargano, as part of the processing procedure, submitted to inter-

viewing as did 58 other candidates who where vying for 38 available faculty positions.

The interviews were conducted, prospective teachers were evaluated and, thereafter, Gargano was advised that she would not be hired as a member of the Trinity faculty. Gargano appealed this decision to the Diocese's Superintendent of Education who declined to overrule it. After filing a claim with the Equal Employment Opportunity Commission, Gargano brought this lawsuit.

## III.

### DISCUSSION

#### A. *Liability*

As noted above, the Diocese challenges on reargument its liability for the breach of contract claim. More specifically, "it is [the Diocese's] position that, as a matter of law, there was no employment relationship between [Gargano] and the Diocese." Defendants' Memorandum of Law ("Defs.' Mem.") at 1. The Diocese argues that the issue of whether such an employer-employee relationship existed was not a question for the jury, but rather one the Court should have determined in the Diocese's favor. For the reasons that follow, the Diocese's argument fails.

#### 1. *Employer–Employee Relationship*

The Diocese argues that the jury verdict cannot stand because "[a] finding that the Diocese was the employer under the circumstances in effect pierced the corporate veil without justification or any rational basis." Defs.' Mem. at 6. "In order for the veil of corporate status to be pierced," explains the Diocese, "one must establish that the corporation is a dummy under which in reality the individual shareholders are carrying on their personal business." *Id.* (*citing Port Chester v. Atlas*, 40 N.Y.2d 652, 357 N.E.2d 983, 389 N.Y.S.2d 327 (1976)). The Diocese argues:

In the instant case, plaintiff has neither alleged nor offered any evidence that the

corporate identities of the Diocese ... and St. Anthony ... are mere shams. Sr. Joanne Callahan testified that the Diocese, the parish schools, and the regional schools are each separate corporate entities. The effective "piercing of the corporate veil" was unwarranted in this case.

*Id.* at 7. In effect, the Diocese argues that Gargano's only recourse was to sue St. Anthony, a school which the Diocese closed and put out of existence.

■ The Court agrees with the Diocese that the record does not indicate that "the corporate identities of the Diocese ... and St. Anthony were mere shams." The Diocese's argument, however, misses the point: It fails to recognize that more than one entity can employ the same individual at the same time—without either being "shams." "A joint employer relationship may be found to exist where there is sufficient evidence that the respondent had immediate control over the other company's employees." *National Labor Relations Board v. Solid Waste Servs., Inc.*, 38 F.3d 93, 94 (2d Cir.1994). The "[r]elevant factors include commonality of hiring, firing, discipline, pay, insurance, records, and supervision." *Id.* "In a joint employer situation, it is assumed that the two employers are separate legal entities, but 'have merely chosen to handle certain aspects of their employer-employee relationships jointly.'" *Hardy v. Kaszycki & Sons Contractors, Inc.*, 870 F.Supp. 489, 494–95 (S.D.N.Y.1994) (*quoting Clinton's Ditch Co-op Co. v. National Labor Relations Board*, 778 F.2d 132, 137 (2d Cir.1985), *cert. denied*, 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986)). "Whether [the Diocese] exercised sufficient supervision and control over [Gargano] to qualify as a joint employer 'is essentially a factual issue.'" *International Longshoremen's Ass'n, AFL–CIO v. Delta Steamship Lines, Inc.*, 832 F.2d 759, 763 (2d Cir. 1987) (*quoting Clinton's Ditch*, 778 F.2d at 136).[2]

---

2. The concept of "joint employer" most frequently arises in the context of claims asserted under the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, whether by individuals or the National Labor Relations Board. In 1944, the Supreme Court held that the concepts "em-

ployee," "employer" and "labor dispute" as used in the NLRA imply something more than their common law definitions, and should be considered in light of the "underlying economic facts rather than technically and exclusively by previously established legal classifications." *National*

The Second Circuit's affirmance in *National Labor Relations Board v. Roman Catholic Diocese of Brooklyn*, 535 F.2d 1387 (2d Cir. 1976), of a decision of the National Labor Relations Board ("NLRB") demonstrates application of the concept of "joint employer" under circumstances virtually indistinguishable from those of the present case. In *Roman Catholic*, the NLRB brought charges of unfair labor practices against, *inter alia*, the Roman Catholic Diocese of Brooklyn ("Roman Catholic") for failing to recognize and bargain with the lay teachers of St. Leo's School, which was one of 185–190 parish-operated primary schools in the Diocese of Brooklyn. *Roman Catholic Diocese of Brooklyn and St. Leo's Parish, and Lay Faculty Ass'n*, 221 N.L.R.B. 831, 1975 WL 6503 at *3 (Nov. 26, 1975). The NLRB held that Roman Catholic was a "joint employer" of the lay teachers of St. Leo's School, along with St. Leo's Parish, which concededly operated the school. The findings made by the administrative law judge, as adopted by the NLRB, included the following facts upon which the NLRB based its decision:

- "The Catholic Schools' office [which was part of Roman Catholic] recruits applications of prospective teachers and maintains them in its files. When vacancies occur or positions become available, the Schools' office sends four or five referrals to the schools for interviews and the schools will select the teacher on the basis of such referrals."

- "When teachers are hired they sign a contract of employment (set forth in [Roman Catholic's] personnel handbook, described below) which is headed 'Catholic Diocese of Brooklyn' providing *inter*

*alia,* that they be paid according to [Roman Catholic's] salary schedule and that they agree 'to observe and enforce the rules prescribed by the Pastor and Principal and the regulations of the Brooklyn Diocesan Schools Office.'"

- "The Diocese Catholic Schools' office prepares a personnel handbook for elementary schools which it distributes to each school, with a copy for all lay and religious staff members. This booklet sets forth terms and conditions of employment and salaries for the parish school teachers. Included therein are the terms and conditions pertaining to such subjects as hiring procedures, fringe benefits, sick leave, maternity leave, leaves of absence, retirement, performance evaluation, job stability, professional growth, renewal and termination of employment (with appeal procedure to an appeal board for termination or suspension), credit for teaching experience, school staff categories, and the like."

- "While Brother Shea testified that the handbook procedures are in the nature of recommendations rather than binding, it appears from the record that the procedures, terms and conditions of employment, and salary schedules as set forth in the handbook are generally followed by the parish schools, it being the exception rather than the rule that they are not."

*Id.* at *3–4.[3]

The conclusion reached—that "it is clear that the Roman Catholic Diocese of Brooklyn

---

Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 128–29, 64 S.Ct. 851, 859, 88 L.Ed. 1170 (1944). Congress, however, amended the statute in 1947 to demonstrate that common law principles should be applied to interpret these concepts. *See National Labor Relations Board v. United Ins. Co. of America*, 390 U.S. 254, 256, 88 S.Ct. 988, 989–90, 19 L.Ed.2d 1083 (1968) ("Congressional reaction to [*Hearst*] was adverse and Congress passed an amendment ... [t]he obvious purpose of [which] was to have the ... courts apply general agency principles in distinguishing between employees and independent contractors under the Act"); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324, 112 S.Ct. 1344, 1349, 117 L.Ed.2d 581

(1992) ("Congress amended the statute so construed to demonstrate that the usual common-law principles were the keys to meaning"). Thus, cases interpreting employment relationships under the NLRA, such as the concept "joint employer," shed light on the issue in this case because they are all determined according to common law principles.

**3.** The NLRB named Roman Catholic as a respondent because it was conceded that St. Leo's Parish did not have a sufficient impact on commerce to meet the Board's jurisdictional prerequisites. By finding that Roman Catholic was a joint employer of the lay teachers at St. Leo's School, the NLRB obtained its jurisdiction, a position which

maintains a significant degree of control over the schools, including the terms and conditions of employment of the teachers, and that it represents itself, with the parish schools, including Respondent St. Leo's, as an integrated enterprise" and "joint employer" (*id.* at *5)—applies with equal clarity to this case. Here, the jury was instructed on a number of factors derived from common law principles in order to enable it to ascertain, *inter alia,* the degree of control the Diocese exerted over the teachers at St. Anthony, including Gargano. These factors comported with those identified by the Second Circuit in *Solid Waste* as relevant to a "joint employer" inquiry; namely, whether the entity exercised control over such decisions as "hiring, firing, discipline, pay, insurance, records, and supervision." *Solid Waste Servs.,* 38 F.3d at 94. The Diocese concedes that the now-defunct St. Anthony was Gargano's employer; thus, the only relevant inquiry for the jury was whether the Diocese was also "an employer" of Gargano.

The Court thus instructed the jury that "[i]n order to determine whether an employer-employee relationship existed between [the] DIOCESE ... and plaintiff, you may consider a variety of factors, any one of which may or may not be controlling":

- the right to control and supervise the manner in which the teaching was performed;

- the ownership of the supplies and materials needed to perform the teaching;

- the responsibility for any expenses involved;

- the right to control the nature and manner of payment of the teachers' salary and benefits; and

- the right to hire and fire teachers.

■ This list of factors fully comports with those identified by courts employing a "traditional" common law test to determine whether an employment relationship exists. For example, in *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), the Supreme Court, in holding that the term "employee" as used in the Copyright Act of 1976 "should be understood in light of the general common law of agency," stated that the traditional test focuses primarily on the "hiring party's right to control the manner and means by which the product is accomplished." *Id.* at 740, 751, 109 S.Ct. at 2173, 2178. *See also Frankel v. Bally, Inc.,* 987 F.2d 86, 89–90 (2d Cir.1993). Other factors include:

The skill required [to produce the product]; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Reid,* 490 U.S. at 751–52, 109 S.Ct. at 2178–79. "No one of these factors is determinative." *Id.* at 752, 109 S.Ct. at 2178.[4]

the Second Circuit upheld. The Supreme Court has since held in another matter that Congress did not intend to extend the jurisdiction of the NLRB to parochial schools because of implications it may have on the Free Exercise and Establishment Clauses of the First Amendment. *See National Labor Relations Board v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). This decision, of course, in no way impacts the determination that Roman Catholic was a joint employer of the lay teachers of St. Leo's School.

**4.** Employment issues arise in cases alleging copyright infringement where the defendant argues that it hired the plaintiff to create the work in question. Other situations where courts uti-

lize a common law test to determine whether an employment relationship exists include claims asserted under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.;* the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.;* and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq. See, e.g., Frankel,* 987 F.2d at 89–90 (existence of employment relationship for claims asserted under the ADEA (and Title VII) "must be determined in accordance with common law agency principles"); *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 319, 112 S.Ct. 1344, 1346, 117 L.Ed.2d 581 (1992) ("In this case we construe the term 'employee' at it appears in [ERISA] and read it to incorporate traditional agency law criteria for

In *Aymes v. Bonelli*, 980 F.2d 857 (2d Cir.1992), the Second Circuit analyzed the *Reid* test and found that it "can be easily misapplied, since it consists merely of a list of possible considerations that may or may not be relevant in a given case." *Id.* at 861. The court explained:

> *Reid* established that no one factor was dispositive, but gave no direction concerning how the factors were to be weighed. It does not necessarily follow that because no one factor is dispositive all factors are equally important, or indeed that all factors will have relevance in every case. The factors should not merely be tallied but should be weighed according to their significance in the case.

*Id.* Thus, "some factors will often have little or no significance ... [while] there are [other] factors that will be significant in virtually every situation." *Id.* These other factors include:

> (1) the hiring party's right to control the manner and means of creation; (2) the skill required; (3) the provision of employee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party. These factors will almost always be relevant and should be given more weight in the analysis, because they will usually be highly probative of the true nature of the employment relationship.

*Id.* Finally, the court noted that "[a]lthough the *Reid* test has not yet received widespread application, other courts that have interpreted the test have in effect adopted this weighed approach by only addressing those factors found to be significant in the individual case." *Id.* (collecting cases).

"The existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts ... is a question of law." *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir.1988) (interpreting existence of employer-employee relationship in context of claim asserted under the Fair Labor Standards Act). *See also Baker v. Texas and Pacific Railway Co.*, 359 U.S. 227, 228, 79 S.Ct. 664, 665, 3 L.Ed.2d 756 (1959) ("[W]e think it perfectly plain that the question [of whether an employment relationship existed for purposes of the Federal Employers' Liability Act], like that of fault or of causation under the Act, contains factual elements such as to make it one for the jury under appropriate instructions as to the various relevant facts under law.... Only if reasonable men could not reach differing conclusions on the issue may the question be taken from the jury") (citations omitted); *Gregory v. Garrett Corp.*, 578 F.Supp. 871, 888–89 (S.D.N.Y.1983) ("The problem with this argument in the context of a motion for summary judgment is that it requires the Court to find as a matter of law that TG was the employer of the crew members; yet, such a finding is one of fact, which should be left to the jury"); *In the Matter of Charles A. Field Delivery Serv., Inc.*, 66 N.Y.2d 516, 521, 488 N.E.2d 1223, 1227, 498 N.Y.S.2d 111, 115 (1985) ("Whether an employer-employee relationship exists is a question of fact, to be decided on the basis of evidence from which it can be found that the alleged employer 'exercises control over the results produced ... or means used to achieve the results.' No one factor is determinative, but control over means is the more important factor to be considered") (citations omitted).

The list of factors submitted to the jury reflected the Court's consideration of the increased weight to be afforded certain factors and the inapplicability of other factors to the circumstances of this case. The Court finalized this list only after extended discussions with counsel, during which the Court eliminated one proposed factor at the Diocese's request. Thus, this final list included those factors which focused on the degree of control the Diocese may have exercised over Gargano in the context of this case. It is important to note that the Diocese did not object to this final list—it neither sought additional factors nor elimination of any of those listed—but rather only to submission of the issue to the jury in the first place. Even now, on reargument, the Diocese does not complain of the factors submitted to the

identifying master-servant relationship"). Thus, examination of these cases sheds light on the

issue of whether the Diocese properly could be considered Gargano's employer.

jury, but instead argues that the Court erred in permitting the jury to determine the employment issue.

■ In any event, the jury's determination that the Diocese was "*an* employer" (not simply "*the* employer") of Gargano, as stated on the special verdict form, is fully supported by the evidence. For example, the teachers' handbook ("Teachers Handbook"), *which was promulgated by the Diocese,* sets forth terms and conditions of employment and salaries for all of the parish school teachers, and includes policies on hiring procedures, tenure, fringe benefits, hospitalization, life and accident insurance, a pension plan, a tax sheltered annuity, sick leave, personal days and bereavement leave, jury duty, maternity leave, leaves of absence, renewal and termination of employment (with appeal procedure for tenured teachers), resignation, teacher evaluation, school calendar, theological requirements for teachers, and the like. These are virtually identical to those topics covered by the teachers' handbook in *Roman Catholic.*

In addition, on April 15, 1991 (and for each April prior to 1991), Gargano and school officials executed a letter of intent ("Letter of Intent") written on *Diocesan letterhead* which states in pertinent part that "St. Anthony of Padua School is pleased to invite you [Gargano] to return as a member of our teaching staff for the school year 1991–92." It also states, *inter alia,* that Gargano's salary was derived "as stipulated by the existing Diocesan salary scale, and approved by the Bishop of the Diocese of Rockville Centre and the Superintendent of Schools." The Letter of Intent further states that it "binds teachers to the policies of the Teachers Handbook." The Teachers Handbook, in turn, states that "[a]s the Diocesan policy, the letter of intent is not an optional matter" and provides the salary schedule for all lay teachers.

The testimony of Sister Joanne Callahan further buttresses the propriety of the jury's verdict by demonstrating that the Diocese possessed and exercised the power to close St. Anthony and created the mechanism by and substantive criteria upon which teachers at Trinity would be hired. According to Sister Callahan, it was the Regional Planning Board, an arm of the Diocese, that dictated which schools would close:

> [T]he prerogative duty of the [R]egional [P]lanning [B]oard [was] to decide what would be the future of Catholic education in that region.... The [R]egional [P]lanning [B]oard labeled those three schools [including St. Anthony] [to] close [and] that they would have one school. It would have its main campus in East Northport and two satellite campuses with nursery and pre-K in Huntington Station and Northport....

Draft Transcript ("Dr. Tr.") at 11 (Mar. 1, 1995).[5] In addition, she testified that upon closure it was the Diocese that determined the rights afforded teachers in securing a position at Trinity and the mechanism by and substantive criteria upon which to obtain such a position:

> Q: When was the first set of rules, instructions, guidelines, whatever you want to call them, put out to the teachers specifically [a]ffecting the teachers as to how it would impact them? What was to be the situation what their *rights* would be, where they would stand in this whole process?
>
> A: In the fall of 1991 there were several regions that already voted to regionalize and we recognize—we needed guidelines with regard to hiring principals and teachers. The [section] 5346.11 [of the Teachers Handbook] were the guidelines that were submitted to the pre-Senate for the Bishop's approval in November [1991] and on November 20th were disseminated to principals and teachers.

*Id.* at 14–15 (question by Robert C. Minion, Esq., attorney for the Diocese; emphasis added). The ability to close schools and thereby terminate teachers, and the ability to determine the circumstances under which a teacher would secure a position at the new school, demonstrates that the Diocese possessed, in effect, the right to hire and fire

---

5. The final trial transcript was not completed at the time of this decision. A draft transcript is on file, although its pagination may differ slightly from the final transcript.

teachers—one of the most fundamental powers of an employer.

In sum, there exists more than ample evidence by which to conclude that the Diocese exercised sufficient control and supervision over St. Anthony's teachers, including Gargano, so as to establish an employer-employee relationship. The jury's verdict on this issue must stand.[6]

### 2. The Teachers Handbook

■ As noted above, the jury determined that the Teachers Handbook promulgated by the Diocese constituted a part of the employment contract between the Diocese and Gargano. This factual question was also properly submitted to the jury. *See, e.g., Weiner v. McGraw–Hill, Inc.,* 57 N.Y.2d 458, 466, 443 N.E.2d 441, 445, 457 N.Y.S.2d 193, 197 (1982) (question of whether employer bound itself to "promise not to discharge plaintiff without just and sufficient cause and an opportunity of rehabilitation" as stated in personnel handbook was "a question for trial"); *Giboleau v. Society of Women Engineers,* 127 A.D.2d 740, 741, 511 N.Y.S.2d 932, 933 (2d Dep't 1987) ("Numerous pertinent factual issues remain that are not resolved by the record, including whether this handbook was official policy and whether its provisions applied to the plaintiff's position of Executive Director. Accordingly, Special Term correctly denied the defendant's cross motion to dismiss these causes of action"); *Wernham v. Moore,* 121 A.D.2d 297, 297–98, 504 N.Y.S.2d 3, 3–4 (1st Dep't 1986) ("There was a question of fact as to whether the employment terms of the personnel manual would apply.... Accordingly, it was error to grant the cross-motion for summary judgment"); *Roffe v. Weil,* 161 A.D.2d 509, 510, 555 N.Y.S.2d 779, 780 (1st Dep't 1990) ("[T]here is a question of fact as to whether the agree-

ment is a simple employment contract or a retainer agreement ... and it was error for the IAS part to hold, as a matter of law, that it is the latter"). *See also* 3 EDWARD J. DEVITT, CHARLES B. BLACKMAR AND MICHAEL A. WOLFF, FEDERAL JURY PRACTICE AND INSTRUCTIONS § 87.16 (West 1987 & Supp.1994) (providing jury instruction on question of whether employment manual constitutes part of an employment contract).

The Diocese did not and does not object to the language of the instruction given to the jury. Rather, it contends that "[t]he mere fact that two parties, in this case Amelia Gargano and St. Anthony of Padua Parish School, entered into an agreement to bind themselves to a handbook created by a third party does not and cannot bind that third party to a contractual obligation." Defs.' Mem. at 8. Thus, according to the Diocese, "the handbook alone does not create an employer/employee relationship between plaintiff and the [D]iocese." *Id.*

■ The Diocese's argument is, in reality, merely a restatement of its argument that it is not Gargano's employer. As noted, the Diocese is not merely a "third party" as it contends, but rather "an employer" of Gargano. Furthermore, the "handbook alone" did not "create [the] employer/employee relationship"; the jury's determination was well supported by a multitude of facts, as discussed above. The jury's conclusion that the Teachers Handbook constituted a part of this employment relationship—that is, the Diocese intended the Teachers Handbook to govern its employment relationships and its employees, including Gargano, had a legitimate expectation that the Diocese would follow the policies contained therein—as determined under language not objected to by the Diocese, was well within the jury's province and

---

**6.** In *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295 (2d Cir.1990), the Second Circuit discussed the stringent standard for overturning a jury's verdict on a Rule 50 motion:

Judgment n.o.v. may be granted only when the movant's evidence is so overwhelming that a reasonable jury could only have reached the opposite result, *Baskin v. Hawley,* 807 F.2d 1120, 1129 (2d Cir.1986), or "'such a complete absence of evidence support[s] the verdict that the jury's findings could only have been

the result of sheer surmise and conjecture.'" *Newmont Mines Ltd. v. Hanover Ins. Co.,* 784 F.2d 127, 132 (2d Cir.1986) (*quoting Mallis v. Bankers Trust Co.,* 717 F.2d 683, 688–89 (2d Cir.1983)). A less stringent standard would risk impermissibly substituting [the court's] view of the evidence for that of the jury.

*Id.* at 1311. The Diocese has wholly failed to demonstrate that the jury's findings were the "result of sheer surmise and conjecture" due to "a complete absence of evidence."

fully supported by the evidence. The verdict on this issue must also stand.

### 3. *The Breach*

The provision of the Teachers Handbook upon which Gargano based her breach of contract claim, and which the Court specifically quoted to the jury in its charge, was Section 5345.11, entitled "Guidelines for Hiring Teachers for New Regional Schools." The provision was promulgated in November 1991 to supplement and amend the Teachers Handbook in order to provide for the mechanism by which teachers would be selected for a position at Trinity after closure of the school at which they worked. It provided for a thorough substantive evaluation of the teacher-applicant:

> When hiring teachers for the new regional school, teachers will be chosen, whenever possible, from the parish schools which will close as a result of forming the new regional school, unless the needs of the children necessitate going outside the available pool of candidates. Each teacher, religious or lay, in the affected schools will be evaluated in all of the following areas:
>
> —Professional qualifications (including official transcript(s), certification(s), teaching experience(s))
>
> —Performance evaluations, interview(s) and letters of reference
>
> —Understanding of and commitment to regional Catholic education
>
> —Length of service in Catholic education
>
> In making the hiring decisions for the new regional school, the controlling-determinative factor will be the needs of the children as determined by the principal and the regional school board.

Gargano testified at trial that the Diocese did not follow these procedures. Among other things, she stated that although she was interviewed collectively by Jeanne Marcone, then-principal of another parish school and soon-to-be principal of Trinity, and Sister Ilene McMann, principal of another parish school, the interview was not "thorough." Dr. Tr. at 38 (Feb. 28, 1995). She testified that the interview lasted only approximately 20 minutes and, during that time, neither Ms. Marcone nor Sr. McMann made reference to any of her evaluations, asked of her goals or interests, inquired of her weaknesses or made "reference to anything . . . specific in [her] career." *Id.* at 6. Gargano also testified that much of the interview consisted of discussion of certain members of the clergy, colloquy totally irrelevant to her qualifications. *Id.* at 4–5. In sum, she expressed her thoughts at the conclusion of the interview as follows:

> And I remember thinking when I left she [Ms. Marcone] really knows very little about me. No more than she did before I came in, certainly nothing about me as an educator or very little about me as an educator. . . . I thought that it was a very peculiar, a very strange interview.

*Id.* at 5–6. Despite the fact that Ms. Marcone disputed the recollections of Gargano regarding the substance of the interview, it was within the jury's province to resolve the factual dispute in Gargano's favor.

It is important to note that both the Diocese and Gargano misconstrue the nature of the breach found by the jury. The Diocese states that "[i]mplicit in the jury's finding that the Dioceses [sic] breached 5345.11 is a determination that the Diocese was required to hire plaintiff." Defs.' Mem. at 11. Likewise, Gargano states that "[t]he jury found that the failure of the Diocese to insure [Gargano's] hiring in the newly created Trinity Regional School constituted a breach of contract." Pl. Br. at 3. Both of these conclusions are plainly wrong.

The specific question posed to the jury was whether the Diocese breached Section 5345.11. Nowhere in Section 5345.11 was the Diocese or any other entity required to hire Gargano (or any other teacher) for a position at Trinity. Rather, the Section merely described the mechanism by which such teachers would be selected and the substantive criteria which would serve as the basis for the hiring decisions. The Diocese's breach, as determined by the jury, was its failure to abide by this mechanism and substantive criteria to which it bound itself. It was, therefore, within the jury's province to determine whether Gargano was considered on the basis of her professional qualifications (includ-

ing official transcripts, certifications and teaching experience), performance evaluations, interviews, letters of reference, understanding of and commitment to regional Catholic education, and length of service in Catholic education.

■ Section 5345.11 also provided Gargano with the right to be considered above all other applicants who were not already teachers in closing parish schools, as long as "the needs of the children" did not necessitate going outside of this pool. Therefore, it was for the jury to consider this issue since Gargano had offered proof that at least one teacher from outside of this pool was hired in her stead. In short, there exists ample evidence in the record to conclude that the jury's verdict that the Diocese "breached Section 5345.11 of the teachers' manual" must stand.

## B. Damages/Remedy

The nature of the breach found by the jury drives the determination of the appropriate damages and/or other remedies available to Gargano. As expected, both the Diocese and Gargano take differing positions on these issues. For the reasons set forth below, the Court rejects the Diocese's argument that Gargano is entitled to *no* damages and also rejects Gargano's argument for specific performance or damages in excess of the $83,300 to which the parties had stipulated.

### 1. The Diocese's Argument

■ In its post-verdict memorandum, the Diocese argues that Gargano is not entitled to any damages, even assuming a breach of contract, because her last annual contractual term of employment expired on August 31, 1992 and she received her salary through that date. Defs.' Mem. at 12. It is true that the general measure of damages for a breach of an employment contract is " 'the wage that would be payable during the remainder of the term reduced by the income which the discharged employee has earned, will earn,

or could with reasonable diligence earn during the unexpired term.' " *Cornell v. T.V. Development Corp.*, 17 N.Y.2d 69, 74, 215 N.E.2d 349, 351, 268 N.Y.S.2d 29, 33 (1966) (*quoting McClelland v. Climax Hosiery Mills*, 252 N.Y. 347, 358, 169 N.E. 605, 609 (1930) (Cardozo, J., concurring)). From this general proposition, the Diocese argues that "[t]he award of [$83,300 in] 'back pay' for the period of September 1, 1992 to the date of verdict was therefore contrary to law, since [Gargano] was paid for the period covered by the April 15, 1991 Letter of Intent." Defs.' Mem. at 12.

The Court finds the Diocese's argument perplexing. The Court and counsel engaged in lengthy discussions in chambers regarding the issue of appropriate damages and counsel agreed that Gargano would receive $83,300 in damages if she prevailed on either her ADEA or breach of contract claim unless the jury determined that she failed to mitigate.[7] Therefore, the parties entered into the following stipulation in open court:

> THE COURT: Counsel, with the appreciation of the Court, among themselves have arrived at a figure of $83,[3]00 which would be given to the jury with simply the comment that that has been the determination that has been made, without any reference to the fact that this was really a product of a stipulation.
>
> I believe Mr. Minion [counsel for the Diocese] was concerned that the word "stipulation" . . . possibly had some negative connotation and in deference to your preference the Court was willing to accommodate that, *but to make sure that this matter is not inappropriately being taken from the jury I ask counsel whether they agree that they have stipulated that the sum will be $83,[3]00 and there is no need for the jury to reflect upon the issue of back pay in that respect.*
>
> MR. MAURO [Gargano's Attorney]: So stipulated.
>
> MR. MINION: So stipulated.

---

7. Accordingly, the issue of mitigation was presented to the jury, which made no deduction from the $83,300 sum. The Diocese does not challenge this determination. *See Cornell*, 17 N.Y.2d at 74, 215 N.E.2d at 352, 268 N.Y.S.2d at

33 ("While the plaintiff is required to mitigate damages upon breach, the burden of proving a lack of diligent effort to mitigate damages is upon the defendant").

Dr. Tr. at 2–3 (Mar. 6, 1995) (emphasis added).

This stipulation obviated the need for the Court to instruct the jury on questions of whether Gargano would have been hired at Trinity if the Diocese had afforded Gargano the substantive evaluation to which she was entitled under Section 5345.11 and, if she would have been hired, the probable duration of her employment at Trinity, along with other factors pertinent to a proper damage award. *See Belanger v. Boise Cascade Corp.,* 968 F.2d 254, 258 (2d Cir.1992) ("A jury would be able to award damages for [the] breach of [the] obligation [to help plaintiff obtain a job within the company] only if it found that such assistance more probably than not would have resulted in her finding [such] a position"); *Evans v. Ithaca Urban Renewal Agency,* 205 A.D.2d 844, 847, 613 N.Y.S.2d 446, 448 (3d Dep't 1994) ("Supreme Court was also correct in not limiting plaintiff's damages to the two-week notification period provided for at-will termination in the contract and instead permitting the jury to consider the likelihood of a notice of termination being issued by defendants").[8] It also afforded both parties reasoned certainty regarding the amount of damages, without which the jury may have concluded that Gargano, at one extreme, would have worked at Trinity until retirement or, at the other, not survived its first year. The final jury charge therefore read:

> If you find defendant TRINITY REGIONAL SCHOOL liable for age discrimination or defendant DIOCESE OF ROCKVILLE CENTRE liable for breach of contract, *the amount of back pay to which the plaintiff is entitled has been determined to be $83,-300.*

Jury Charge at 27 (emphasis added).

■ The Diocese did not object to this charge nor could it have in light of the

stipulation. It is disingenuous, therefore, for the Diocese now, on reargument, to challenge for the first time the award of damages by inferring that it only stipulated to the arithmatic calculation of the amount of back pay rather than an award of damages itself if Gargano proved successful. The Court therefore rejects its argument.

**2. *Gargano's Argument***

Gargano, on the other hand, argues for specific performance to compel Trinity to hire her as a teacher or, in the alternative, "front pay" damages in excess of the $83,300 stipulated amount until she reaches age 65. The parties agreed that the Court would decide both of these issues:

> THE COURT: And I believe that counsel have agreed that the Court will, if needs be, consider all those issues and make a determination on the front pay issue in the event that the plaintiff is successful at a separate time at which time the Court, if necessary, would hear the parties and take some additional testimony if that were indicated and render a decision on the f[ront] pay separate and apart from the jury's concern; that agreed to. . . . Does that fairly resemble what we all agreed to?
>
> MR. MAURO: Yes, Your Honor.
>
> MR. MINION: Yes, Your Honor.

Dr. Tr. at 1–2 (Mar. 6, 1995).[9]

■ The problems with Gargano's argument are threefold. First, both the specific performance remedy and the alternative of front pay damages until age 65 are premised upon a breach of contract to *hire* Gargano as a teacher at Trinity rather than a breach of the mechanism by and substantive criteria upon which an employment decision would be reached, as found by the jury.

■ Second, even if the jury had determined that Gargano was entitled to a position

---

**8.** The Court notes, however, that ample evidence exists in the record to support a jury finding—if the issue had been submitted to the jury—that Gargano would have been offered a position at Trinity if she had received a proper substantive evaluation under the guidelines established in Section 5345.11, based upon her extensive teaching experience (over twenty-three years), outstanding performance evaluations and commit-

ment to Catholic education, among other qualifications.

**9.** While this colloquy concerned Gargano's claim under the ADEA, it was implicit and fully understood that the Court would decide these same issues with respect to her breach of contract claim.

at Trinity, none of the cases cited by Gargano support the position that she would be entitled to specific performance of this common law employment contract; each applies the remedy of specific performance under circumstances far removed from those here presented. *See Gotthelf v. Stranahan,* 138 N.Y. 345, 34 N.E. 286 (1893) (real estate contract); *Phalen v. United States Trust Co.,* 186 N.Y. 178, 78 N.E. 943 (1906) (contract to leave property by will); *Mofsky v. Goldman,* 3 A.D.2d 311, 160 N.Y.S.2d 581 (4th Dep't 1957) (same); *Underhill v. Valentine,* 267 A.D. 778, 46 N.Y.S.2d 93 (2d Dep't 1943) (contract to retire plaintiff as a police officer, place his name on roll of Police Pension Fund and pay him annual pension); *City of Buffalo v. International Railway Co.,* 135 Misc. 504, 240 N.Y.S. 113 (Sup.Ct.1930) (contract for removal of railway tracks and pavement of street), *aff'd,* 232 A.D. 868, 249 N.Y.S. 929 (4th Dep't 1931); *Caliendo v. McFarland,* 13 Misc.2d 183, 175 N.Y.S.2d 869 (Sup.Ct.1958) (action by union members against union and other members to enforce union constitution and by-laws). To the contrary, there exists ample support for the opposite position—that specific performance is not available to remedy breaches of common law employment contracts. *See Sinicropi v. Bennett,* 92 A.D.2d 309, 314 n. 2, 460 N.Y.S.2d 809, 813 n. 2 (2d Dep't 1983) ("Indeed, as specific performance, the remedy of reinstatement is simply not available under New York contract principles" for breaches of common law employment contracts) (*citing Staklinski v. Pyramid Elec. Co.,* 6 N.Y.2d 159, 164–65, 160 N.E.2d 78, 80, 188 N.Y.S.2d 541, 543–44 (1959) (dissent); *Cuppy v. Ward,* 227 N.Y. 603, 125 N.E. 915 (1919); *Bleendes v. Feller-*

*man,* 264 A.D. 223, 35 N.Y.S.2d 247, 248–49 (2d Dep't 1942); *Miller v. Warner,* 42 A.D. 208, 59 N.Y.S. 956 (4th Dep't 1899)); *see also Cornell,* 17 N.Y.2d at 74, 215 N.E.2d 349, 351, 268 N.Y.S.2d at 32 ("The breach of [an employment] contract action is an action at law and the principles applicable thereto must be applied"). Hence, for these reasons, Gargano's argument for specific performance must fail.[10]

Third, Gargano has offered no credible support for her position that she is entitled to an award of "front pay," a remedy available in this circuit under the ADEA. *See Whittlesey v. Union Carbide Corp.,* 742 F.2d 724 (2d Cir.1984). The ADEA expressly grants a claimant alleging age discrimination "such legal or *equitable* relief as may be appropriate to effectuate the purposes of [the act], including without limitation judgments compelling employment, *reinstatement* or promotion, or enforcing the liability for amounts [owing to a person as a result of the violation of the ADEA]." 29 U.S.C. § 626(b) (emphasis added). "Reinstatement is the preferred remedy under the ADEA." *Blim v. Western Elec. Co.,* 731 F.2d 1473, 1479 (10th Cir.1984).

In *Whittlesey,* the Second Circuit held that "front pay is, in limited circumstances, an appropriate remedy under the ADEA" based upon the ADEA's "broad grant of remedial authority" and because the court "had previously encouraged district judges in this circuit to fashion remedies designed to ensure that victims of age discrimination are made whole." *Id.* at 727–29. Front pay is only available, however, when

---

10. Unlike common law breach of contract actions, reinstatement is routinely ordered where authorized by statute, such as in employment discrimination actions and actions involving public school teachers. *See, e.g., McKennon v. Nashville Banner Publishing Co.,* —— U.S. ——, ——, 115 S.Ct. 879, 884, 130 L.Ed.2d 852 (1995) ("When confronted with a violation of the ADEA, a district court is authorized to afford relief by means of reinstatement, backpay, injunctive relief, declaratory judgment and attorneys fees") (citing 29 U.S.C. § 626(b)); *United States v. Burke,* 504 U.S. 229, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992) ("If the court finds that the employer has engaged in an unlawful employment practice [in violation of Title VII], it may enjoin the prac-

tice and 'order such affirmative action as may be appropriate, which may include, but is not limited to reinstatement....'") (citing 42 U.S.C. § 2000e–5(g)); *Adlerstein v. Board of Education of the City of New York,* 64 N.Y.2d 90, 101, 474 N.E.2d 209, 214, 485 N.Y.S.2d 1, 6 (1984) (Section 3020–a(4) of New York Education Law provides for reinstatement of a public teacher with full back pay if acquitted of disciplinary charges); *Chauvel v. Nyquist,* 43 N.Y.2d 48, 52, 371 N.E.2d 473, 474, 400 N.Y.S.2d 753, 754 (1977) (Section 2510(2) and (3) of New York Education Law provides for reinstatement in order of seniority of teachers dismissed due to abolishment of teaching position upon vacancy of similar position).

reinstatement is not possible, such as when there no longer exists a position available to the plaintiff at the time of judgment or the employer-employee relationship has been irreparably damaged by animosity. *Id.* at 728. The authority for awarding front pay, according to *Whittlesey,* is based upon the statute's express grant of equitable relief afforded to ADEA claimants. *Id.*

While the nomenclature "front pay" is absent from New York jurisprudence in common law breach of contract actions, the concept seems subsumed in the traditional damage remedy in such cases. In making a "front pay" determination under the ADEA, a court will look "to determine the availability of employment opportunities, the period within which one by reasonable efforts may be re-employed, the employee's work and life expectancy, the discount tables to determine the present value of future damages and other facts that are pertinent on prospective damage awards." *Koyen v. Consolidated Edison Co.,* 560 F.Supp. 1161, 1168 (S.D.N.Y.1983). These same factors are relevant in common law breach of contract actions to determine the monetary damages suffered by a wrongfully discharged employee because they help assess the likely duration of employment if the employee had not been terminated. *See id.* ("Courts and juries are not without experience in assessing damages for future loss of earnings in breach of employment contact ... cases"). As a New York appellate court recently stated:

> It is well established that while an employee alleging wrongful discharge prior to expiration of the term set forth in the employment contract is entitled to recover as actual damages ... the wage that would be payable during the remainder of the term reduced by the income which the discharged employee has earned, will earn, or could with reasonable diligence earn during the unexpired term ..., *he or she may also recover special damages to the extent that they are shown to be in the contemplation of the parties at the time the contract is made....* [T]o the extent that the purported contract provided for additional renewal terms at plaintiff's option ... or *plaintiff otherwise can estab-*

*lish that continued employment was specifically contemplated or promised, she may be able to recover the special damages alleged....*

*Woodford v. Benedict Community Health Center,* 188 A.D.2d 863, 864, 591 N.Y.S.2d 582, 583 (3d Dep't 1992) (emphasis added; citations and quotations omitted). *See also Slater v. Kane,* 275 A.D. 648, 92 N.Y.S.2d 640, 643 (1st Dep't 1949) ("If an agreement ... was entered into and breached by defendants, [the plaintiff] is entitled to recover damages. The fact that there is an element of uncertainty as to the amount will not preclude a recovery if some reasonable basis for a determination of the amount exists"), *rearg. denied,* 276 A.D. 835, 93 N.Y.S.2d 725 (1st Dep't 1949).

The Court has carefully reviewed the record in this case and concludes that Gargano is not entitled to any damages beyond the $83,300 amount to which the parties stipulated. Accordingly, it denies her request for such additional sums.

### 3. *Interest*

Under New York law, Gargano is entitled to prejudgment interest on the $83,300 as a matter of right. *See* N.Y.Civ.Prac. L. & R. 5001(a) ("Interest shall be recovered upon a sum awarded because of a breach of performance of a contract"); *see also Practice Commentaries* C5001:2 ("Where the contract or property damage case is brought at law, interest is recoverable as a matter of right"). "Where ... damages [are] incurred at various times, interest shall be computed ... upon all of the damages from a single reasonable intermediate date." N.Y.Civ. Prac. L. & R. 5001(b). The $83,300 in stipulated damages was calculated from the day after Gargano's last employment with St. Anthony (September 1, 1992) until the date of the jury's verdict (March 7, 1995). The Court finds that a "single reasonable intermediate date" is December 3, 1993, the midway point between these two dates. In addition, Gargano is entitled to interest from March 7, 1995 until entry of judgment, id. 5002, and post-judgment interest pursuant to 28 U.S.C. § 1961.

## IV.

### *CONCLUSION*

For all of the foregoing reasons, the Court hereby **DENIES** the Diocese's request to set aside the verdict and **ORDERS** that the Clerk of the Court enter judgment in favor of Gargano in the amount of $83,300 plus 9% pre-judgment interest commencing from December 3, 1993 to March 7, 1995, and further **ORDERS** that the Clerk award post-verdict interest pursuant to N.Y.Civ.Prac. L. & R. 5002 and post-judgment interest pursuant to 28 U.S.C. § 1961.

**SO ORDERED.**